**UNITED STATES**

v.

**Richard Donald HAGLER, Jr., 464 24 4421, Seaman Recruit (E–1) U. S. Navy.**

**NCM 78 0174.**

U. S. Navy Court of Military Review.

Sentenced Adjudged 11 Oct. 1977.

Decided 13 Aug. 1979.

---

CAPT Joseph F. Smith, USMCR, Appellate Defense Counsel.

LT Lawrence W. Muschamp, JAGC, USN, Appellate Defense Counsel.

LT Sander Mednick, JAGC, USNR, Appellate Government Counsel.

CAPT Craig L. Kemmerer, USMCR, Appellate Government Counsel.

Before CEDARBURG, C. J., and ROOT and GREGORY, JJ.

GREGORY, Judge:

Appellant was tried by a general court-martial military judge, sitting alone. Pursuant to his pleas, appellant was found guilty of conspiracy to steal automobile parts, unauthorized absence of approximately 1 month, willful damage to privately owned automobiles (three specifications), and larceny of automobile parts from other Navy personnel (four specifications), in violation of Articles 81, 86, 109, and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 886, 909, 921. He was sentenced to a bad-conduct discharge, confinement at hard labor for 8 months, and forfeiture of all pay and allowances. This sentence was within the terms of a pretrial agreement and was approved by the convening authority without modification.

Appellant commenced serving his sentence to confinement on 11 October 1977. He was designated a "base parolee" on 3 November 1977; however, that status was revoked on 6 December 1977 by the Corrections Officer because of alleged involvement with drugs by appellant. Subsequently, on 19 January 1978, appellant suffered the revocation of 15 days "good time credit" on his sentence by Commanding Officer, Naval Administrative Command, Naval Training Center, Great Lakes, Illinois, also because of alleged involvement with drugs.

On appeal, appellant alleges that the military judge erred in denying his motion to dismiss the charges for lack of a speedy trial; that he was denied due process of law in the revocation of the "good time credit"; and that he was denied due process of law in the revocation of his "base parolee" status.

We find merit in appellant's contention concerning revocation of his "good time credit." We will set forth our rationale as to each of appellant's assigned errors.

I

Appellant moved to dismiss the charges for lack of a speedy trial prior to entry of his pleas. He renews his claim on appeal. The evidence of record, however, does not support this claim. A Chronology

of Events is included in the record as Appellate Exhibit 2. This Chronology reveals that appellant was originally confined on 29 June 1977 and released on 7 July 1977. After an alleged unauthorized absence of approximately 16 hours, he was placed in restriction on 20 July 1977, where he remained until 29 July 1977. After a second alleged unauthorized absence of approximately 32 hours, appellant was again placed in confinement on 1 August 1977 and remained in pretrial confinement until his trial commenced on 7 October 1977. As a result, a period of 100 days elapsed between the initial confinement of appellant and his trial; however, only 75 days were spent in confinement. Even if we were to consider the 9 days appellant spent in restriction the equivalent of additional pretrial confinement, *see United States v. Schilf*, 1 M.J. 251 (C.M.A.1976), the period would still not be sufficient to raise the presumption of lack of speedy trial enunciated in *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971).

█ Even though we find the *Burton* presumption not to be applicable to this case, we must still determine whether the Government has proceeded with reasonable diligence and without deliberate oppression of the appellant or a lack of concern for the requirement of expeditious prosecution. *United States v. Powell*, 2 M.J. 6 (C.M.A. 1976); *United States v. Amundson*, 23 U.S. C.M.A. 308, 49 C.M.R. 598 (1975). This determination requires a functional analysis of all facts involved in the delay, including the length of the delay, the reasons for the delay, any demand for speedy trial by the appellant, and any specific prejudice to the appellant. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

█ The record of trial discloses no indication of prejudice to appellant in the preparation and presentation of his defense; nor is there any indication of an oppressive design or plan on the part of the Government to delay the start of appellant's trial. The Chronology of Events reveals that appellant did submit a request for speedy trial on 16 September 1977; however, prompt steps were then taken to refer the charges to a general court-martial and to bring appellant to trial. The Chronology indicates that the initial Article 39(a), 10 U.S.C. § 839(a) session was held on 29 September 1977, only 13 days after appellant's request for speedy trial. The Government appears to have complied completely with the second prong of *United States v. Burton, supra*, which addresses the Government's obligation upon receipt of a request by an accused for speedy trial.

As previously noted, exactly 100 days were consumed in bringing this case to trial. This delay is longer than normal, although not what we would consider inordinate in comparison with other general courts-martial. We note that a considerable portion of the time was used in completion of the Naval Investigative Service investigation prior to commencement of the Article 32, 10 U.S.C. § 832 Pretrial Investigation. It is quite possible that the Pretrial Investigation could have begun earlier without awaiting completion of the Naval Investigative Service investigation; however, it appears doubtful that much time would have been saved because some of the evidence necessary to prosecute the case only became available late in the Naval Investigative Service investigation. Once the Pretrial Investigation did commence, the case appears to have progressed at a rapid pace.

Review of the Chronology of Events does indicate that there were several lapses when the Government could have moved more swiftly. It has long been held, however, that brief periods of inactivity in an otherwise active prosecution are not unreasonable or oppressive and that the touchstone for measurement of compliance with the provisions of the Uniform Code of Military Justice concerning the right to speedy trial is not constant motion but rather reasonable diligence in bringing the charges to trial. *United States v. Tibbs*, 15 U.S.C.M.A. 350, 35 C.M.R. 322 (1965). Examination of all the circumstances surrounding the delay in this case leads us to the conclusion that the Government proceeded with reasonable

diligence, without any deliberate oppression of appellant, and without any lack of concern for appellant's right to expeditious prosecution. *United States v. Powell* and *United States v. Amundson*, both *supra*. Appellant has not been denied a speedy trial.

## II

With respect to the revocation of "good time credit," the record of trial reveals that on 12 January 1978 appellant was given six Benadryl pills by another confinee in the Great Lakes Correctional Center. On 14 January 1978, appellant was identified as having received and used this drug, and he was questioned by Chief Petty Officers Wood and Robinson concerning the matter. He was fully advised of his rights against self-incrimination, and he acknowledged in writing his understanding of these rights and signified his waiver of his right to remain silent and his right to consult with counsel. Appellant orally admitted at this time his receipt and use of the drug, and on 16 January 1978 he provided a written statement to the same effect (Appendices II, III, and VI).

On 18 January 1978, appellant appeared before the Corrections Officer and again admitted his involvement with the drugs. He was advised that the matter would be referred to the Commanding Officer, Naval Administrative Command, Naval Training Center, with a recommendation that appellant forfeit 15 days "good time." On 19 January 1978, appellant appeared before the Commanding Officer and was advised of the allegations against him. When asked about his involvement, appellant told the Commanding Officer "I did it, sir." When further questioned as to why he used the drugs, appellant stated "I don't have much to say about it, sir." The Commanding Officer then orally advised appellant of his decision and the reasons therefor, stating, "You have admitted to the use of drugs, other confinees have implicated you, so I am going to revoke 15 days of your good

time. . . ." Appellant was then dismissed by the Commanding Officer (Appendices I, IV, V, and VI).

On 22 February 1978, Commanding Officer, Naval Administrative Command, denied a request by the counsel who had represented appellant at trial that the good time credits be restored. On 18 April 1978, the next superior in command, Commander, Naval Training Center, Great Lakes, denied the relief requested in a complaint of wrongs submitted pursuant to Article 138, Uniform Code of Military Justice (Appendix VII), 10 U.S.C. § 938.

On appeal, appellant contends that these revocation procedures violated due process of law and also violated his rights under Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831. We find merit only in the contention concerning denial of procedural due process.

As to appellant's contention concerning violation of his Article 31 rights, he notes that the lawyers who had represented him at his court-martial were not notified prior to his being questioned by Chief Petty Officers Wood and Robinson. Appellant argues that this was a violation of the mandate of *United States v. McOmber*, 1 M.J. 380 (C.M.A.1976), rendering his confession involuntary and an improper basis for revocation of his "good time credit" at the subsequent hearing. We do not believe the situation in this case, involving internal disciplinary proceedings of a correctional facility, is controlled by *McOmber* which involved further questioning as to offenses which were the subject of a military criminal investigation.[1] We also note that Chief Petty Officers Wood and Robinson were questioning appellant with respect to a matter entirely unrelated to the charges resolved at appellant's court-martial, *cf. United States v. Harris*, 7 M.J. 154 (C.M.A. 1979), and that Chief Petty Officers Wood and Robinson were apparently unaware that appellant was still represented by counsel at the time of their interview with

---

1. For a thorough discussion of the adverse impact of interjecting counsel into internal disciplinary proceedings of a correctional institution, *see Wolff v. McDonnell, infra.*

appellant. *See United States v. Palenius*, 2 M.J. 86 (C.M.A.1977). Prior to the interview, appellant had been fully advised of his rights, and he expressly waived his right to counsel and his right to remain silent. We discern no violation of Article 31 or the right to counsel under these circumstances.

As to the alleged denial of procedural due process, the situation is controlled by the decision of the United States Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), a case also involving the deprivation of "good time credits." In *Wolff*, the Court ruled that, before earned "good time credits" could be taken away, due process requires that a prisoner be provided a hearing where he would enjoy the following rights:

(1) written notice of the charges at least 24 hours prior to the hearing;

(2) an impartial fact-finder;

(3) a written record stating both the reasons for the decision as well as the evidence relied upon (although the fact-finder may delete evidence if personal or institutional safety requires, so long as the fact of omission is reported on the record); and

(4) the right to call witnesses and present documentary evidence where this will not be disruptive or hazardous to the institution.

In subsequent decisions, the Supreme Court has characterized the removal of privileges previously granted to a confinee as a purely internal disciplinary function of the correctional system's administration, and the Court has acknowledged the desirability of allowing correction officials the broad discretion to handle such matters with the efficiency and flexibility needed to promote their correctional goals. *See Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). As to the internal disciplinary administration of a correctional system, the Court has held that confinees are entitled to "minimum due process" to ensure that the Government adheres to its self-imposed standards and does not act in an arbitrary and capricious manner. *See Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

There is certainly no indication that the Government has acted in an arbitrary and capricious manner in the procedures followed in revoking appellant's good conduct time. We have serious questions, however, that these procedures were sufficient to satisfy the "minimum due, process" requirements set forth in *Wolff v. McDonnell, supra*, and the subsequent cases. Appellant did receive written notice of allegations against him when he was questioned by Chief Petty Officers Wood and Robinson and was advised via a "Suspect's Rights Acknowledgment" (appendix II) that he was suspected of "violation of UCMJ Art. 92, 10 U.S.C. § 892, possession of a controlled substance." This occurred on 14 January 1978, 5 days before the hearing before the Commanding Officer. The advice could certainly have been made more complete and helpful to appellant in defending himself, however, if it had provided data as to the nature of the controlled substance and the time and place of the alleged offense.

We have no problem in concluding that the Commanding Officer was an impartial fact-finder. Appellant has even conceded this in his brief in support of his original petition for extraordinary relief. We do have some problem, however, with the adequacy of compliance with the requirements for a written record and advice concerning the right to call witnesses and present other evidence. A written record was not prepared after the hearing on 19 January 1978 until a "Memorandum For The Record" (appendix I) was drafted on 27 April 1978 and at that time became available to appellant. This Memorandum lists the evidence relied upon by the Commanding Officer and his reasons for his action. The Memorandum also indicates that appellant was "given an opportunity to make any statement he wished in his behalf," but the subject of witnesses or documentary evidence is not addressed. Finally, we note that this Memorandum, which the Government urges that

we accept as a written record of the proceedings, was not prepared until 3 days after the date on which appellant would normally have been released from confinement if the good time credits had not been revoked. There would appear to have been more than adequate time in this case to prepare the written record required by *Wolff v. McDonnell, supra,* prior to the normal expiration date of appellant's sentence to confinement.

After consideration of all factors bearing on the revocation of appellant's good conduct time, we conclude that the procedures employed do not satisfy "minimum due process" requirements which have been set down by the United States Supreme Court and that appellant is entitled to sentence relief.

### III

Appellant also contends that he was denied due process of law in the revocation of his "base parole" status. In this regard, the allied papers included in the record of trial reveal that, following his sentencing on 11 October 1977, appellant was eventually advanced on 3 November 1977 to the confined status of Base Parole.[2] By such, he was entitled to certain privileges to include: base liberty on weekends, a cash allowance of $10.00 per week, head of the line privileges in the Correctional Center messhall, and assignment to a barracks physically located outside the Correctional Center compound.

On 5 December 1977, the Corrections Officer or Officer in Charge of the Correctional Center, Lieutenant Commander Abernathy, received information that drugs were present in the "base parolee" barracks, in violation of the agreement that each "base parolee" must sign. Subsequently, several confinees implicated appellant in the use and distribution of these drugs. Appellant was on emergency leave

at this time. When appellant returned on 9 December 1977, he was confronted by Lieutenant Commander Abernathy, who states:

SR Hagler returned to the Correctional Center from emergency leave at 0008 on 9 December 1978. I then interviewed him at about 0855 that day. I confronted him with his being implicated in an investigation concerning drug involvement within the correctional center. He admitted to accompanying Thompson to an attempted drug buy off base (in violation of his base parolee agreement), and to knowledge of use of drugs by base parolees. I then asked Hagler if he understood that I would have to revoke his base parolee status and he replied "yes". [Appendix L, affidavit of LCDR Abernathy, at 1–2].

Following this session with the Corrections Officer, appellant was advised that his "base parole" privileges were being withdrawn, and he was being returned to normal minimum custody status. He remained a minimum custody prisoner until released upon completion of his sentence to confinement on 9 May 1978.

Appellant now complains that he has been denied due process of law in the revocation of his "base parole" status, both in the denial of procedural due process in the procedures followed by the Corrections Officer to effect the revocation and also in the fact that in such revocation appellant as a Navy prisoner did not enjoy the same procedural rights as an Army or Air Force prisoner.[3]

■ We are unable to concur in appellant's contention that the hearing conducted by the Corrections Officer prior to revocation of the "base parole" status did not meet the requirements of procedural due process. We do not agree that the due process requirements for the revocation of "parole" in the civilian context apply to the

---

**2.** The term "Base Parole" has now been replaced by the term "Installation Custody." *See* Affidavit of LCDR Abernathy.

**3.** Similar arguments were presented to the Court of Military Appeals via a petition for

extraordinary relief filed on 23 January 1978. A show cause order issued on 8 February 1978. Relief was denied without opinion on 8 May 1978. 5 M.J. 153 (C.M.A.1978).

revocation of "base parole" status within the military correctional system. Except for the attachment of a common label, civilian "parole" and military "base parole" status are totally dissimilar in both fact and law. Civilian parole is a conditional release from a confinement status, being in the nature of a conditional pardon or suspension of the unexpired sentence. 67A C.J.S. Pardon and Parole § 39. Military "base parole" status is not a conditional release from confinement. A "base parolee" remains within the "minimum custody" confinement classification. *See, e. g.* Articles 404.4 and 505.5*d*(5), SECNAVINST 1640.9, Navy Corrections Manual. His adjudged sentence is in full force and effect, and it is not in any manner modified by a conditional pardon or suspension. A base parolee is a minimum custody confinee, and the only difference between him and any other minimum custody confinee is the fact that he has been granted certain special privileges within the confinement status (Appendix M, Affidavit of LCDR Abernathy, at 2).

█ Because the civilian parolee enjoys a different factual and legal status from that of the military base parolee, the standards of due process applicable to the revocation of each status also differ. The revocation of civilian parole, involving a drastic inter-status change from "liberty without confinement" back to "confinement," is subject to the due process standards enunciated in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) and *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). The revocation of military base parole, however, involves an intra-status modification from "confinement with limited privileges" to "confinement as adjudged at trial." The mere removal of privileges previously granted to a confinee has been characterized as a purely internal disciplinary function of the correctional system's administration, and the Supreme Court of the United States had acknowledged the desirability of allowing correction officials broad discretion to handle these matters with the efficiency and flexibility needed to promote their correctional goals. *Meachum v. Fano, Montanye v. Haymes,* both *supra.*

Reference to the seminal decision of *Wolff v. McDonnell, supra,* is also instructive. At 418 U.S. 572 n.19, 94 S.Ct. at 2982 the Supreme Court stated:

> We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges.

This statement was reaffirmed in *Baxter v. Palmigiano, supra,* 425 U.S. at 323, 96 S.Ct. 1551. Inasmuch as we consider the status of "base parole" merely to be an extension of privileges to a minimum custody military confinee, the revocation of these privileges does not involve the full panoply of due process requirements discussed in *Wolff v. McDonnell, supra.* It is only necessary that the Government adhere to its "self-imposed standards" and not act in an "arbitrary and capricious manner." *Baxter v. Palmigiano, supra.* As previously indicated, the Corrections Officer in this instance conducted an interview with appellant and notified him of the allegations against him. Appellant was given an opportunity to respond and admitted his involvement, whereupon the Corrections Officer advised appellant of the reason for revocation of his "base parole" status. Under these circumstances, we consider appellant's "minimum due process" rights to have been properly protected during the revocation hearing.

█ Left for consideration is the fact that appellant as a Navy prisoner did not enjoy the same procedural rights as an Army or Air Force prisoner in the revocation of his "base parole" status. For Army and Air Force prisoners, revocation of "base parole" status can only be accomplished after a hearing before a Discipline and Adjustment Board. *See* AR 190–47, paragraphs 7–1a(3) and 9–12*b*; AFR 125–18, paragraph 4–12. There is no question that the Army and Air Force regulations provide broader protections than their Navy counterpart. Paragraph 404.4*f* of SECNAVINST 1640.9, Department of the Navy

Corrections Manual, merely provides, "the Corrections Officer may revoke the base parolee status of any prisoner at any time for cause."

As appellant acknowledges, however, the language of Article 58, Uniform Code of Military Justice, and the Military Corrections Facilities Act, 10 U.S.C. §§ 951–954, specifically authorizes each service Secretary to issue rules, regulations, and instructions on matters relating to confinement and parole matters for his own service. Although the broad policy guideline centers on uniformity, the Secretaries have been expressly empowered to exercise their discretion in formulating the specific rules within the broader policy. The Secretary of the Navy has formulated the policy on revocation of base parolee status in compliance with the statutory provisions by means of the aforementioned paragraph 404.4f of the Navy Corrections Manual. Pursuant to this provision, the Corrections Officer in this case informed appellant of the allegations against him, allowed appellant to respond to these allegations, and then advised appellant of the reasons for revocation of base parole. Although the Navy's revocation procedures are not the same and do not provide the same procedural rights as those of the other services, we consider the uniformity guidelines and equal protection principles to be satisfied by the fact that the Corrections Officer in this case adhered to the minimum due process requirements applicable to all of the services. *See generally United States v. Hoesing*, 5 M.J. 355 (C.M.A.1978).

■ In summary, we have concurred only in appellant's contention that he was denied due process of law in the revocation of his "good time credits." The record of trial indicates that appellant served an additional 15 days of confinement as a result of this due process violation. Of course, the record of trial also reveals, as we noted previously, that appellant was released from confinement upon completion of his sentence thereto on 9 May 1978. The Government has argued that the issue is now moot and that we should decline relief.

There is support for this argument. *See United States v. Brownd*, 6 M.J. 338 (C.M.A. 1979). *See also United States v. McClelland*, 7 M.J. 117 (C.M.A.1979) (Cook, J., dissenting); *United States v. Taylor*, 6 M.J. 28 (C.M.A.1978). There is also persuasive legal reasoning which supports the viewpoint that improper post-trial confinement may justify adjustment of other aspects of the sentence still amenable through reassessment. *See United States v. Brownd, supra* (Cook, J., concurring in the result); *United States v. Malia*, 6 M.J. 65 (C.M.A.1978) (Cook, J., dissenting). *See also United States v. Jacox*, 5 M.J. 537 (N.C.M.R.1978); *United States v. Walker*, No. 77 1570 (NCMR 9 April 1979) (unpublished). In the instant case, additionally, it must be noted that appellant applied to this Court for relief from this denial of due process before his term of confinement had run. *See* Appellant's Petition for Extraordinary Relief in the Nature of Habeas Corpus dated 29 March 1978. We dismissed this application for extraordinary relief and allowed appellant to raise the matter again during the course of regular appeal. Under these circumstances, we find that the issue has not been mooted and that the question of sentence relief appropriately should be addressed. For this reason, we will reassess the sentence approved on review below in light of the post-trial denial of due process.

As previously noted, the sentence approved by the convening authority provides for a bad-conduct discharge, confinement at hard labor for 8 months, and forfeiture of all pay and allowances. In view of the nature of appellant's offenses, we consider an unsuspended bad-conduct discharge to be entirely appropriate. We will provide relief to appellant, however, in the forfeitures to be approved.

Accordingly, the findings of guilty and only so much of the sentence approved on review below as provides for a bad-conduct discharge, confinement at hard labor for 8 months and forfeiture of $250.00 per month for 8 months are affirmed.

Chief Judge CEDARBURG and Judge ROOT concur.